THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NATALIE WITNEY,

                Plaintiff,

    v.

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

                Defendant.

Case No: 2:20-cv-01273-RAJ

ORDER

This matter comes before the Court on Plaintiff Natalie Witney's ("Plaintiff" or "Ms. Witney") Rule 52 Motion for Trial on the Administrative Record and Defendant United of Omaha Life Insurance Company's ("Defendant" or "United") Rule 52 Motion for Judgment on the Record. Dkt. ## 14, 12. Both parties have filed Responses. Dkt. ## 15, 16. The Court finds that oral argument is not necessary to resolve the Motions. Fed. R. Civ. P. 78.

Plaintiff was a member of a Long Term Disability ("LTD") Plan administered by United. The Plan and Plaintiff's claims herein are governed by the Employment Retirement Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Plaintiff has asserted a claim for benefits under 29 U.S.C. § 1132(a)(1)(B). Plaintiff also seeks a declaration that United breached its fiduciary duty to Plaintiff by wrongfully denying her claim, and a declaration clarifying her rights under the LTD Plan, holding that absent an

ORDER-1

improvement in her medical conditions such that Plaintiff is no longer deemed disabled under the Plan, that Plaintiff is entitled to receive her full monthly benefit under the plan for its remaining term. Dkt. #1 (Complaint). Defendants seek dismissal of Plaintiff's Complaint. Dkt. # 11 (Answer).

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Rule 52 Motion, and **DENIES** Defendant's Rule 52 Motion.

## I.     BACKGROUND

Plaintiff worked at Peoples Bank as a Retail Manager from approximately November 2014 to December 23, 2016. AR 133; AR 56; AR 126.[1] Through her position as a branch manager at Peoples Bank, Plaintiff was a participant in a group LTD Plan that United administers and funds. AR 1-43. As described by Peoples Bank, Plaintiff's position required that she "lead branch growth and operations ensuring outstanding customer service." AR 131. As branch manager, she was also "responsible and accountable for branch management and supervision." *Id.* This included: supervising and training staff, ensuring that staff was compliant with regulations and oversight requirements, participating in branch marketing programs and developing new business, growing the branch's consumer lending portfolio, handling customer service, developing and implementing branch goals and budgets, and other responsibilities. *Id.* Qualifications for the position included customer service, business development, communication, organization, and interpersonal skills. AR 132.

Plaintiff alleges that while she was employed at Peoples Bank an executive sexually harassed her, and the harassment, along with prior instances of sexual trauma, exacerbated symptoms of post-traumatic stress disorder (PTSD), AR 312, and bipolar disorder, AR 366, such that she could not work. *See* Dkt. # 14. In January 2016,

---

[1] Pages from the Administrative Record are cited as, e.g., "AR 1," where the number in the citation refers to the final six-digit number of the page's Bates number with preceding zeroes excluded.  *See* Dkt. # 13-1, 13-2, 13-3.

Plaintiff applied for and received leave under the Family and Medical Leave Act ("FMLA") through March 20, 2017. AR 126, 1949.

On March 31, 2017 Plaintiff applied for LTD benefits through her employer's plan, indicating that December 23, 2016 was her last day of work and that December 26, 2016 was the date on which she was first unable to work. AR 121. Plaintiff's LTD application stated that she was unable to work due to her Bipolar Disorder and PTSD. *Id.* Where the application asks "[b]efore you stopped working, did your condition require you to change your job or the way you did your job?" Plaintiff responded: "I was required to have daily exposure with a co-worker's behavior which triggered PTSD symptoms." *Id.* In her application, Plaintiff listed Sondra Laverne, Kathryn Gaudette, and Sejal Graber as the medical professionals who provided her care. AR 122. On April 20, 2017, Plaintiff left her employment in what Peoples Bank characterized as a "medical separation." AR 551.

United's Plan provided the following definitions:

*Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:

a.) During the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

b.) After the Elimination Period, You are:

1. Prevented performing at least one of the Material Duties of your Regular Occupation on a part-time or full-time basis; and
2. Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to the same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, *Disability* and *Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

ORDER-3

AR 34.

"Regular occupation" is defined as:

"The occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will instead by considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with another service or other information that We determine to be of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region."

AR 36.

Further, the Plan contains mental health-related limitations, which state: "If You are Disabled and your Disability is a result of a Mental Disorder, Your benefits will be limited to a total of 24 months per occurrence[.]" AR 25. The Plan defines Mental Disorder as: "any condition or disease, regardless of its cause, listed in the most recent edition of the International Classification of Diseases (ICD) and the Diagnostic and Statistical Manual of Mental Disorders (DSM) as a mental disorder. Not included in this definition are conditions or diseases related to Alcohol and Drug Abuse and/or Substance Abuse." AR 35.

Finally, the Plan provides for an "Elimination Period," defined as "the number of days of Disability which must be satisfied before You are eligible to receive benefits." AR 34.  The Plan states: "The Elimination Period is the later of: a.) 90 calendar days; or b.) the date on which Your short-term Disability ends." AR 14.

## II.     FINDINGS OF FACT

1. In October 2017, Plaintiff began to seek treatment for mental and physical health symptoms at the Everett Clinic. AR 303. While Plaintiff initially presented for a rehabilitative medicine consultation for neck and back pain on October 3, 2016, Plaintiff's provider, Kelly Weaver, MD, noted that Plaintiff had a "significant

history of depression and anxiety." *Id.* Plaintiff's diagnoses on that date include "history of sexual abuse, anger, nightmares, panic attacks, stressful life event affecting family, PTSD (post-traumatic stress disorder)." *Id.* Among Plaintiff's symptoms listed on that date were "Tingling / Focal weakness / Dizziness" and "Insomnia / Memory loss / Nervous/Anxious." AR 305.

2. On October 20, 2016, Plaintiff reported to Sejal Graber, ARNP that she was "having a lot of stress at work" due to a "retaliatory environment" created by "a senior manager who is sexually harassing her." AR 308. Plaintiff also reported that she was having panic attacks, and hoped to take a day off of work "due to anxiety." *Id.* Plaintiff reported she was looking for another job, and Graber provided Plaintiff with a letter to excuse her from work. AR 309.

3. On November 1, 2017, Plaintiff saw LMHC Sondra Laverne, LMHC. She provided further background about her mental health history and her current circumstances. Laverne wrote: "Natalie has a history of sexual abuse. She was molested at age 4 by a female cousin. She was raped at 19 by a stranger while she was away at college. The rape had been in the paper; she left college to return home…Natalie has been experiencing sexual harassment by a senior executive at her work place… she's finding it very difficult to work at her workplace, although she loves the work she does. She's considering leaving her job to take another position elsewhere… Natalie is anxious and has panic attacks. She has night terrors which are about bad things happening to her family." AR 310. Laverne also noted that Plaintiff was having difficulties with her ex-husband and that her current partner was out of work. *Id.* On this date, Laverne noted that there was "NO major depression." AR 312. Laverne observed Plaintiff's mood, appearance, thinking, and memory to be reasonable and appropriate. *Id.* Under "Assessment/Plan," Laverne observed that "[t]he concerns of POST TRAUMATIC STRESS appear to be long-term," and listed learning healthy coping skills to decrease symptoms of

ORDER-5

anxiety and process trauma as a goal. *Id.* While Laverne indicated that Plaintiff's chronic and acute risks were "low," she included a generic safety plan to address the risk of Plaintiff engaging in self-harm. AR 312-313. Additionally, Laverne conducted depression screenings, called a Patient Health Questionnaire (PHQ)-12 and PHQ-9, which are "instruments for making criteria-based diagnoses of depressive and other mental disorders commonly encountered in primary care." *Norman v. Berryhill*, No. 17-cv-04108-SI, 2018 WL 3620092, at * 6 (E.D. Wash. Mar. 6, 2020). On this date, Plaintiff's PHQ-12 score was 1.7 (on a scale from 0 – 3, with higher scores being more severe), and her PHQ-9 depression results were all at or above the standard cutoffs that suggest current major depression. AR 309-310.

4. On November 8, 2016, Plaintiff saw LMHC Laverne. Plaintiff reported various stressors in her life, such as ongoing parenting conflicts with her ex-husband and her partner being denied unemployment benefits, which left Plaintiff as the sole earner in her family. AR 315. Plaintiff reported that, although she loved her job, she was considering looking for employment elsewhere. *Id.* Her PHQ-12 score was 2.6, and her PHQ-9 scores were above the major depression cutoffs. AR 314-315. Laverne noted, "[t]he symptoms of POST TRAUMATIC STRESS disorder appear to be still present." AR 315.

5. On November 23, 2016, Plaintiff saw ANRP Katherine Gaudette at Everett Clinic. Plaintiff had been referred to Gaudette for medication evaluation and management for the treatment of her anxiety and mood symptoms. AR 318. Gaudette summarized Plaintiff as an individual "with a history of PTSD and mood symptoms who presents with increased anxiety in the setting of increased life stress." AR 323. Plaintiff's statements to Gaudette included: "6 months, my brain isn't getting a break from any of it," "Starting to feel myself completely break down and lose it," and "When I wake up in the morning, my first thoughts are, 'I

hate my life.'" *Id.* Gaudette noted symptoms of PTSD, severe increased stress, and significant chronic pain. *Id.* Plaintiff was experiencing "depressed mood, sleep disturbance, loss of interest, guilt, low energy, impaired concentration, appetite changes, psychomotor changes and suicidal ideation" and "panic attacks and PTSD." AR 319. Gaudette also noted Plaintiff's history of "TIAs," or transient ischemic attacks during very stressful times in her life. AR 321, 323. At this visit, her PHQ-12 score was 2.9 and her PHQ-9 scores were above the major depression cutoffs. AR 318. When asked how often she had thoughts of "being better off dead or of hurting self," Plaintiff reported that such thoughts had occurred more than half the days. *Id.* Plaintiff was diagnosed with PTSD and a mood disorder. AR 324.

6.  On November 29, 2017, Plaintiff saw LMHC Laverne. Plaintiff reported recent stress due to conflict with her ex-husband and that she was considering obtaining other employment. AR 327. Laverne noted that recent events had "triggered" Plaintiff's PTSD symptoms. *Id.* Her PHQ-12 score was 3, and her PHQ-9 scores were above the cutoffs, suggesting major depression. AR 326-327. While Laverne observed that Plaintiff's affect and presentation were calm and normal, Laverne noted that Plaintiff's PTSD and mood disorder symptoms "appear[ed] to be somewhat worse." AR 327.

7.  On December 5, 2017, Plaintiff again saw LMHC Laverne. Plaintiff indicated that while she felt a "little happier" and "less irritable," she still continued to "struggle at work." AR 333. Plaintiff reported that she was still required to work around her harasser and she was upset with management for not protecting her. *Id.* Plaintiff also reported an increase in nightmares and difficulty sleeping. *Id.* Laverne again diagnosed Plaintiff with PTSD and mood disorder and noted that her PTSD symptoms were still present but her mood disorder symptoms were "gradually

improving." AR 333-334.  Plaintiff's PHQ-12 score was 2.3 and her PHQ-9 scores were above the major depression cutoff. AR 333.

8. On December 17, 2016, Plaintiff saw LMHC Laverne. AR 335. Laverne reported that "[c]urrent events at work are triggering past trauma issues" and that Plaintiff was having night terrors. *Id.* Plaintiff indicated that her anxiety was high, with Laverne observing that Plaintiff was "biting her nails pretty severely." *Id.* Plaintiff's partner accompanied her to the appointment, and he disclosed to Laverne that Plaintiff had thoughts that she would be "better off dead" when she was overwhelmed or stressed. *Id.* Her PHQ-12 score was 3 and her PHQ-9 scores were all above the cutoffs, suggesting major depression. *Id.* The symptoms of Plaintiff's PTSD and mood disorder diagnoses "appear[ed] to be worse." AR 336.

9. On December 23, 2016, Plaintiff saw LMHC Laverne. Plaintiff reported having anxiety about a meeting to discuss the workplace harassment. AR 339. Plaintiff's moods were "up and down," and she had times where she felt "overwhelmed" and wanted relief from the stress. *Id.* While Plaintiff denied that she had thoughts of wanting to be dead, Laverne again discussed a safety plan to engage should Plaintiff have thoughts of self-harm and Laverne was not available. *Id.* Laverne observed that while Plaintiff had a "pleasant mood" and was "anxious," she noted that Plaintiff's PTSD and mood disorder symptoms were still present. AR 340. Her PHQ-12 score was 2.8 and her PHQ-9 scores were all above the cutoffs, suggesting major depression. AR 339.

10. December 23, 2016 was Plaintiff's last day at work at Peoples Bank. AR 980.

11. On December 28, 2016, Plaintiff saw ARNP Gaudette at Everett Clinic for medication management regarding her mood disorder, PTSD, and capillary fragility syndrome. AR 342. Plaintiff reported to Gaudette that Plaintiff received a "very upsetting" response from her employer the day before regarding her harassment case. *Id.* Plaintiff's anxiety had never been so high before, her blood

ORDER-8

pressure was elevated (which increased Plaintiff's concern of a TIA), her legs were visibly restless during the appointment, and she was experiencing night terrors every night. *Id.* Gaudette noted "highly increased stress with re-traumatization due to work on her case, with potential for continuing re-traumatization." *Id.* While Gaudette observed that Plaintiff's behavior was "cooperative" and "pleasant," she also observed that Plaintiff was "fidgety" and had a "nervous highly anxious appearance." AR 344. Further, Gaudette assessed that Plaintiff had a low acute risk of suicide, but that there was a chronic risk of suicide based on Plaintiff's past and overall factors. AR 345. Gaudette diagnosed Plaintiff with a mood disorder, PTSD, and capillary fragility. AR 345-346. Gaudette prescribed diazepam (known as Valium), as needed for severe anxiety. AR 346. At this time, Plaintiff was also taking lamotrigine, propranolol, sertraline (known as Zoloft), and gabapentin. AR 344. Plaintiff's PHQ-12 score was 2.9 and her PHQ-9 scores were all above the cutoffs, suggesting current major depression. AR 343.

12. Two days later, on December 30, 2016, Plaintiff saw LMHC Laverne. Plaintiff reported to Laverne that, after her meeting with supervisor at work, Plaintiff turned the situation over to her attorney, and would focus on negotiating a reasonable severance package, take some time to focus on healing, therapy, and her family, and look for another job. AR 348-349. Laverne observed that Plaintiff's mood disorder and PTSD symptoms appeared to be "gradually improving." AR 349. Plaintiff's PHQ-12 score was 2.6 and her PHQ-9 scores were all above the major depression cutoffs. AR 348.

13. Plaintiff applied for FMLA leave on January 5, 2017. AR 126. In response to "my reason for requesting a leave of absence" Plaintiff stated: "[b]eing treated for PTSD and anxiety – doctor notes will explain conditional release information." *Id.* Plaintiff's FMLA request was ultimately approved on January 25, 2017. *Id.* LMHC Laverne submitted a "Certification of Health Care Provider for Employee's

Serious Health Condition" in which she was instructed to provide responses based on her "medical knowledge, experience, and examination of the patient." *Id*. Laverne stated that she treated Plaintiff starting on November 1, 2016, that she had been referred for a psychiatric assessment and medication management, and that Plaintiff had been prescribed medication due to her condition. AR 128. Laverne listed Plaintiff's diagnoses of mood disorder, post-traumatic stress disorder, and listed increased level of anxiety, depressive symptoms, and panic attacks as symptoms. *Id*. Laverne also explained that Plaintiff's "problems with memory/concentration inhibit [her] ability to complete daily tasks such as completing documentation…." *Id*. Laverne opined that Plaintiff's incapacity began on November 1, 2016 and that she would be incapacitated for a continuous period due to her medical condition. AR 129. When asked if Plaintiff's condition would cause flare-ups that would prevent Plaintiff from performing her job functions, Laverne responded "Yes." AR 129. Laverne indicated that it was necessary for Plaintiff to be absent from work during flare ups, explaining that "current work conditions trigger [Plaintiff's] PTSD & mood disorder symptoms." *Id*. Under "Additional Information," Laverne wrote:

> [Plaintiff's] PTSD symptoms have escalated due to her reported experience of having to work in an environment which brings her into contact with a co-worker who has engaged in sexual harassment and the subsequent investigation of sexual harassment.

*Id*.

14. Katherine Gaudette submitted an Addendum in support of Plaintiff's FMLA application on January 9, 2017. AR 130. In support of Plaintiff's application, Gaudette stated:

> I concur with Sondra Laverne, LMHC, MA that pt's symptoms of PTSD and mood disorder (rule-out bipolar d/o) have been exacerbated due to her reported hostile working conditions, making her unable to work currently. She also has a diagnosed condition of Capillary Fragility, with a past history

> of two separate transient ischemic attack (TIA) events when experiencing extreme stress. This medical condition puts her at increased risk for further cardiovascular events, including further TIAs, as well as stroke events, should she return to work under these present hostile (reported) conditions given her current psychiatric state.

*Id.*

15. On January 6, 2017, Plaintiff saw LMHC Laverne. At this appointment, Laverne assisted Plaintiff in filling out FMLA paperwork. AR 350. Plaintiff reported that her thoughts that she should not be alive had disappeared, and she was feeling less stress related to her job and finances. *Id.* Plaintiff still reported to Laverne that she was "racing around" in an attempt to "out run[] [her] thoughts." *Id.* Laverne and Plaintiff discussed ways to decrease her anxiety and Plaintiff reported that she was proud that she purchased a purse and got her nails done. *Id.* Laverne observed that while Plaintiff had a "pleasant mood," she was still "anxious." AR 351. Plaintiff's PTSD and mood disorder symptoms were still present. *Id.* Laverne advised Plaintiff to follow up with her primary care provider. AR 350. Her PHQ-12 score was 2 and her PHQ-9 scores were all above the cutoffs, suggesting major depression. *Id.*.

16. On January 11, 2017, Plaintiff had her follow-up appointment with nurse practitioner Sejal Graber. Graber wrote, "Patient states that she was advised by her psychologist and therapist that she should follow up with her PCP. To go over her medications and make sure she is doing ok from all the stress in her life including PTSD." AR 352. Plaintiff was concerned that she would experience a TIA due to high anxiety and reported that she was not taking care of herself—she was smoking a pack of cigarettes per day, was not eating regularly, and was drinking energy drinks to give herself energy. *Id.* Plaintiff also reported that she occasionally experienced tingling in her forehead for which she would take a Valium, although Plaintiff reported that the medication did not work well for her. AR 352-353.

ORDER-11

Graber diagnosed Plaintiff with PTSD, mood disorder, and anxiety. AR 354. Graber noted that she would ask Gaudette to consider alternative prescriptions to Valium, as Plaintiff reported that it was not helpful. AR 355.

17. Plaintiff saw LMHC Laverne on January 13, 2017. Laverne stated that she wrote a letter excusing Plaintiff from going to work for 90 days. AR 356. Plaintiff reported that some life events were moving in a positive direction: her partner got a job, which meant that Plaintiff could be a stay-at-home mom and focus on her and her child's health. *Id.* Further, Plaintiff was taking steps to reduce her anxiety, like exercising and listening to therapeutic music. *Id.* Laverne found that Plaintiff's PTSD and mood disorder symptoms were still present. AR 357. Plaintiff's PHQ-12 score was 1.9 and two of her PHQ-9 scores were at the cutoff suggesting major depression, while one score was below the cutoff. AR 356.

18. Plaintiff next saw LMHC Laverne one week later on January 20, 2017. Plaintiff reported that she was experiencing less stress now that she was taking FMLA leave. AR 358. She was still experiencing stress due to custody issues with her ex-husband, but she was feeling better on her current medications. *Id.* Laverne found Plaintiff's PTSD and mood disorder symptoms to be "gradually improving." *Id.* Her PHQ-12 score was 2.3 and her PHQ-9 scores were all at or above the cutoffs, suggesting major depression. *Id.*

19. On January 27, 2017, Plaintiff met with LMHC Laverne. Plaintiff was experiencing less stress, due to being away from her job, but still reported to Laverne that "it's been a rough couple of weeks." AR 360. Laverne noted that Plaintiff's PTSD and mood disorder symptoms were still present. *Id.* Plaintiff's PHQ-12 score was 1.8 and her PHQ-9 scores were all at or above the cutoffs, suggesting major depression. *Id.*

20. Plaintiff saw ANRP Gaudette on January 31, 2017 for a psychiatric follow up appointment. AR 362. Plaintiff had been prescribed a variety of medications at this

ORDER-12

time, including: clonazepam, sertraline, lamotrigine, estradiol, meloxicam, trazodone, gabapentin, albuterol, nicotine patches, nicotine placrilex, hydrochlorothiazide, ipratropium, and fluticasone propionate. AR 364. Plaintiff reported that while using trazodone, she would awaken five times per night, and her thoughts were racing. AR 363. Gaudette saw evidence of hypomania, and Plaintiff reported increasing symptoms of hypomania while on sertraline recently. AR 365. Gaudette diagnosed Plaintiff with PTSD, a history of TIA events, capillary fragility, and bipolar disorder. AR 364.

21. Plaintiff next saw Laverne on February 3, 2017. Plaintiff reported stress related to her mother and sibling, and further reported that she had been crying and emotional over the past week. AR 369. Plaintiff's PTSD and bipolar disorder symptoms were still present. *Id.* Plaintiff's PHQ-12 score was 1.8 and her PHQ-9 scores were all at or above the cutoff, suggesting major depression. AR 368.

22. On February 13, 2017, Plaintiff saw Sejal Graber to follow up on depression and other physical health issues. By this time, Plaintiff had seen an improvement in her stress and mood and reported no suicidal thoughts. AR 376. Plaintiff was attending counseling, which she reported as helping her process the past emotions stemming from her molestation and rape, although it had been "challenging." *Id.* Plaintiff reported that she was taking clonazepam (commonly known as Klonopin) and that if she skipped a dose, her mind would race. *Id.* At this visit, Graber observed that Plaintiff was "doing well emotionally," and still engaging in counseling. AR 377-378.

23. Plaintiff saw counselor Laverne on February 18, 2017 for a crisis appointment. AR 379. Plaintiff reported various stressors in her life: co-parenting difficulties with her ex-husband, financial concerns due to the upcoming end of her disability benefits, and frustrations with her parents. *Id.* She reported self harm—she had bruises on her arms from hitting walls. *Id.* Laverne observed that "memories of

past trauma are resurfacing" and that Plaintiff's bipolar disorder and PTSD appeared to be "somewhat worse." *Id.* Additionally, Plaintiff reported "vague thoughts of not wanting to be here," although she denied that she would kill herself. *Id.* Laverne discussed Everett Clinic's after-hours crisis care hotline and suggested that Plaintiff call 911 if necessary. *Id.* Plaintiff's PHQ-12 score was 2.7 and her PHQ-9 scores were above the cutoff, suggesting major depression. AR 378-379.

24. On February 22, 2017 Plaintiff saw Katherine Gaudette. Plaintiff reported that her trauma was "highly activated," and she was experiencing frequent flashbacks, nightmares, and dissociation. AR 381. This was "further triggered" by family and work issues. AR 381. Gaudette observed that Plaintiff had a "'nervous' highly anxious appearance." AR 383. At this time, Plaintiff had been prescribed sertraline, doxepin, Abilify, and lamotrigine. AR 382-383. Gaudette diagnosed Plaintiff with bipolar disorder, PTSD, and capillary fragility. AR 384-385.

25. Plaintiff saw LMHC Laverne on February 24, 2017. Plaintiff reported improvements, such as no longer hitting things. AR 387. She reported that she was happy to be off work and have time to be with her children. *Id.* Further, Plaintiff indicated that she was doing "part-time bookkeeping" for her partner's business. *Id.* Laverne noted that Plaintiff's bipolar disorder and PTSD symptoms were still present. AR 388.

26. On March 3, 2017, Plaintiff saw LMHC Laverne and reported that she was still working for her partner's company. AR 389. While Plaintiff's nightmares had decreased, she was still hitting walls because pain took "other feelings away." *Id.* Plaintiff's bipolar disorder and PTSD symptoms were "gradually improving." AR 390. Her PHQ-12 score was 1.7 and two of her PHQ-9 scores were at or above the cutoffs that suggest major depression. AR 389.

27. Plaintiff saw ANRP Gaudette on March 7, 2017 for a medication management appointment. Plaintiff reported an extreme increase in stressors. On March 17,

2017, Plaintiff saw LMHC Laverne and reported that she had started working 40 hours per week for her partner but would set boundaries and cut back to 25 hours per week. AR 400. Plaintiff's bipolar disorder and PTSD symptoms were "gradually improving." *Id.* Plaintiff's PHQ-12 score was 1.3 and two of her PHQ-9 scores were at or above the cutoffs that suggest major depression. AR 400.

28. By Plaintiff's next appointment on March 20, she reported that working 40 hours per week was "incompatible with her mental stability currently" because her anxiety skyrocketed. AR 402. Plaintiff had been working hard on group therapy but had longstanding "significant irritability and anger." *Id.* Her PHQ-12 score was 2 and all of her PHQ-9 scores were above the cutoff. AR 403. On March 23, 2017, Plaintiff saw Michael Mandzuik, MD, and reported that she repeatedly hit her wrist against the wall. AR 409. Dr. Mandzuik noted that Plaintiff had a history of PTSD. *Id.* On March 31, 2017, Plaintiff saw Laverne and reported that she was experiencing stress due to custody issues and that she was completing paperwork to apply for long-term disability benefits. Plaintiff was hitting things when stressed, feeling overwhelmed, and would think "I don't want to do this." AR 415. Her bipolar disorder and PTSD symptoms appeared to be worse. *Id.*

29. On or around March 31, 2017, Plaintiff submitted out her application for LTD benefits. AR 122. Plaintiff listed her last day of work as December 23, 2016 and December 16, 2016 as the date on which she was first unable to work. AR 121. Plaintiff indicated that she was unable to work due to "bi-polar, unspecified, and PTSD." *Id.* In response to the question, "Before you stopped working, did your condition require you to change your job or the way you did your job?" Plaintiff stated: "I was required to have daily exposure with a co-worker's behavior which triggered PTSD symptoms." *Id.* Plaintiff listed Laverne (mental health therapist), Gaudette (psychiatric nurse practitioner), and Graber (family medicine ANRP) as her medical providers. AR 122.

30. Plaintiff's providers provided statements in support of her LTD application. In her April 27, 2016 statement, Gaudette listed bipolar disorder as Plaintiff's primary diagnosis and PTSD, capillary fragility syndrome, and a history of TIAs as secondary conditions contributing to her disability. AR 139. Gaudette listed "mood and affect instability" as symptoms and noted that Plaintiff's condition was related to her work in that it was "exacerbated significantly by work stressors." *Id.* It was Gaudette's opinion that Plaintiff "should not be in any type of work environment due to significant affect and mood stability." AR 140.

31. LMHC Laverne's statement in support of Plaintiff's application also listed bipolar disorder as her primary diagnosis and PTSD as a secondary condition. AR 141. Laverne listed depression, mood swings, and difficulty concentrating and focusing as symptoms that were "triggered" by sexual harassment. *Id.* Laverne stated that Plaintiff should not have contact with co-worker who allegedly harassed her. AR 142. Like Gaudette, Laverne's prognosis for Plaintiff was "guarded," AR 140, 142, and Laverne believed that Plaintiff needed to get "stabilized on medication and process impact of trauma on [her] daily functioning." AR 142.

32. On April 11, 2017, Plaintiff met with ARNP Gaudette.  She reported increased memory difficulties, which may have been due to "breaking of mania," and an adjustment to her medication. AR 419. Her PHQ-12 score was 1.9 and her PHQ-9 scores were all at or above the cutoffs. AR 420. Plaintiff next saw LMHC Laverne on April 14, and on that date, her PHQ-12 score was 2 and her PHQ-9 scores were at or above the cutoffs. AR 425. Plaintiff reported some financial stress, but a decrease in anxiety. AR 426. The day before, Plaintiff felt agitated and almost hit the wall, but was able to stop herself. Next, on April 25, Plaintiff reported to Laverne that she was experiencing problems with her memory, confusion, dizziness, disorientation, and difficulty focusing. AR 430. She was "groggy" and "relearning to live." *Id.* Laverne observed that Plaintiff's bipolar disorder and

PTSD symptoms were gradually getting better. *Id.* Her PHQ-12 score was 1.8 and her PHQ-9 scores were all at or above the cutoffs. *Id.* Also, on this date, Laverne completed LTD paperwork for Plaintiff. *Id.*

33. On April 20, 2017, Plaintiff officially left her work with Peoples Bank. AR 551. Plaintiff's departure from work was characterized as a "medical separation." *Id.*

34. On May 4, 2017, Plaintiff saw ARNP Gaudette for a medication management follow up. On that date, her PHQ-12 score was 2.3 and her PHQ-9 scores were at or above the cutoffs. AR 439-440. Gaudette observed that Plaintiff had "significantly increased anxiety in the setting of increased life stress. Over time, evident hypomania, and some true mania history has been uncovered…" AR 442. Further, Gaudette stated that Plaintiff was at risk for a TIA during her "current significant stress increase." *Id.*

35. LMHC Laverne submitted a Behavioral Health Attending Physician Statement in support of Plaintiff's LTD claim on May 12, 2017. AR 506-508.

36. On May 15, 2017, Plaintiff saw ARNP Gaudette for a transitional appointment, as Plaintiff was transitioning to another health care provider, and had an upcoming intake appointment with Compass Health. AR 447.

37. From June 6, 2017, Plaintiff was seen by Compass Health, and continued to meet with providers there. AR 220-262. It is undisputed that Plaintiff evidenced heightened symptoms during this time. After several months of developing a relationship with her provider at Compass Health, Plaintiff began to address her sexual trauma issues in November 2017. AR 247.

38. Around July 2017, RN Julie Grancer reviewed Plaintiff's claim and medical documentation on file. AR 2178-2180. Grancer found that she was "unable to identify restrictions or limitations from a mental or physical standing in this file from last day worked and forward." AR 2180. Dr. Timothy Tse provided a

physician recommendation, stating that he agreed "completely" with Grancer's assessment. AR 2181.

39. On August 8, 2017, United wrote to LMHC Laverne to request further clarification regarding Plaintiff's medical condition. AR 974. United wrote, "the medical documentation obtained from The Everett Clinic does not support any mental and nervous physical restrictions to preclude [Plaintiff] from the duties of her own occupation…." *Id.* Further, United stated that there was no significant change in her condition that would preclude her from working. *Id.* Laverne spoke to United claims manager Jack Fu via telephone on August 17, 2017. AR 2187. According to Mr. Fu's notes regarding the conversation, Laverne stated that although she had not recently seen Plaintiff (as Plaintiff's care had been transferred to Compass Health in June), Plaintiff's prior providers were "very concerned for her well-being" and did not feel that Plaintiff could work, due to her medications. *Id.* Laverne told Mr. Fu that United should trust the observations and judgments of Plaintiff's providers and again advised that Plaintiff could not work. *Id.*

40. On August 23, 2017 United provided an occupational analysis of Plaintiff's job. AR 935. The analysis stated that the essential functions of Plaintiff's job were to lead branch business growth and operations, and to be responsible for branch management and supervision. *Id.* This was a light exertion position. *Id.*

41. On August 24, 2017, United denied Plaintiff's LTD claim, stating that Plaintiff "failed to satisfy the conditions of the policy." AR 921. Plaintiff appealed United's denial of her claim on December 29, 2017. AR 300. In support of her appeal, Plaintiff submitted medical records from Compass Health, which began on June 6, 2017. AR 159-299. These records included a June 6, 2017 mental health assessment that diagnosed Plaintiff with bipolar disorder and PTSD, AR 263, and a psychological evaluation conducted by psychologist Margaret Cunningham,

PhD, wherein Plaintiff was found to meet the criteria for bipolar disorder, anxiety, panic disorder, and PTSD. AR 289-295.

42. Psychiatrist Adam Raff, MD conducted the review of Plaintiff's file for the purposes of her appeal. Dr. Raff found that the medical records did support Plaintiff's diagnoses of PTSD and bipolar disorder, but the symptoms of the diagnoses did not appear to have a significant impact on Plaintiff's daily functioning until she began seeing providers at Compass Health. AR 541-542.[2] Dr. Ruff found that limitations impacting Plaintiff would include:

- An inability to deal with normal work pressures and stresses.
- An inability to supervise, train and monitor subordinate staff.
- An inability to provide optimal and consistent customer service to vendors.
- An inability to work collaboratively with peers during meetings and presentations.
- An inability to develop and participate in marketing programs and community events.

AR 542.

## III. CONCLUSIONS OF LAW

### A. Standard of Review

Both parties have filed their respective Motions under Federal Rule of Civil Procedure 52, asking that the Court essentially conduct a bench trial on the administrative record. Further, both parties have agreed that this Court should review United's denial of benefits *de novo*. Dkt. ## 12 at 20; 14 at 2. The Court accepts the parties' stipulation that this Court's review should be *de novo. Rorabaugh v. Cont'l Cas. Co.*, 321 Fed.Appx. 708, 709 (9th Cir. 2009). This is the proper standard of review where, as here, the Plan does not confer discretion on the administrator, as Washington law prohibits the inclusion of such clauses in disability insurance policies. *See Firestone*

---

[2] Plaintiff incorrectly asserts that Dr. Raff initially found Plaintiff to be disabled from December 23, 2016 to January 4, 2018, and that United asked Dr. Raff to change his opinion. Dkt. # 14 at 18. The Court can find no evidence in the record to support this assertion.

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 155 (1989) (holding that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"); *see also* WASH. ADMIN. CODE § 284-96-012.

This procedure is outlined in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (noting that "the district court may try the case on the record that the administrator had before it"). In a trial on the administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Id.* Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the Court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[] . . . is a bench trial and not the disposition of a summary judgment motion"); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 n.2 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52").

Further, "when conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The administrator's "evaluation of the evidence is not accorded any

presumption of correctness." *Perryman v. Provident Life Ins. & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 942 (D. Ariz. 2010). In reviewing the administrative record and other admissible evidence, the Court "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F.Supp.3d 1237, 1251 (N.D. Cal. 2014) (quoting *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)).

When a district court "reviews a plan administrator's decision under the *de novo* standard of review, the burden is placed on the claimant." *Muniz*, 623 F.3d at 1294; *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (claimant "bears the burden of proving his entitlement to contractual benefits"). However, this does not relieve the plan administrator from its duty to engage in a "meaningful dialogue" with the claimant about her claim. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("[W]hat 29 C.F.R. § 2650.503-1(g) calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it").

### B.  Plaintiff Was Disabled During the Elimination Period and Beyond

At issue is whether Plaintiff was disabled during the 90-day Elimination Period contained within the LTD Plan and during the months leading up to June 6, 2017, as both parties concede that Plaintiff was disabled after that date. *See* Dkt. ## 12 at p. 19, 15 at p. 15.  Under the terms of the Plan, Plaintiff was disabled if she was prevented from performing at least one of the material duties of her occupation on a part-time or full-time basis during the Elimination Period. AR 34. The Plan states that disability will be considered "continuous" during the Elimination Period unless it stops for more than 90 accumulated days during the Elimination Period. AR 14. After the Elimination Period, Plaintiff would remain disabled if she was prevented from performing at least

one of the material duties of her occupation on a full time or part time basis, and unable to generate earnings over 99% of her basic monthly earnings due to that same sickness. *Id.* The Court finds that the record demonstrates that Plaintiff was disabled throughout the 90-day Elimination Period that began on the initial date of her disability, December 26, 2016, and ended on March 25, 2017. Further, the Court finds that Plaintiff was disabled after the Elimination Period ended through January 4, 2018.

        i.    *Statements of Plaintiff's Providers are Reliable Evidence of Disability*

        United argues that Laverne's and Gaudette's statements in support of Plaintiff's LTD claim are "conclusory" and "after-the-fact," and should therefore carry little weight in support of Plaintiff's disability. Dkt. # 12 at 26. Indeed, each of United's reviewers—RN Graber, Dr. Tse, and Dr. Ruff— gave little weight to Laverne's and Gaudette's statements in support of Plaintiff's LTD claim and found that Plaintiff's providers did not provide support for her disability prior to June 2017.  Plaintiff argues that the "consistent, unwavering" support of Plaintiff's medical providers should be given great weight, as treating physicians have a greater opportunity to know and observe patients, especially in mental health disability claims. Dkt. # 14 at 22.

        Here, Laverne's and Gaudette's observations, diagnoses, and medical advice to Plaintiff contained in the Everett Clinic medical records from October 2016 to June 2017 are reliable, contemporaneous evidence of Plaintiff's mental health disability. From October 2016 to June 2017, Plaintiff saw Everett Clinic providers approximately 30 times for appointments. *See* AR 303-447. At each appointment, Plaintiff was diagnosed with PTSD, mood disorder, or bipolar disorder. While the providers' notes indicate that Plaintiff's symptoms varied, at times improving and at other times becoming worse (often in response to life stressors, including her job), the symptoms caused by her mental health diagnoses remained a consistent presence. Plaintiff consistently experienced anxiety (AR 308, 323, 335, 346, 350, 352, 357, 402, 442), mood swings (AR 101), irritability (AR 402), anger (AR 303, 402), night terrors (AR

303, 310, 335, 342), and reports of self-harm and suicidal ideations (AR 319, 335, 379, 389). These observations are consistent across providers and across time, including the Elimination Period and beyond. Notably, the record does not show that Plaintiff experienced "continuous" improvement under the Plan, which would have required that Plaintiff show improvement for 90 accumulated days during the Elimination Period. AR 14.

Also, the statements of Plaintiff's treating providers in support of Plaintiff's FMLA and LTD claims are consistent with their contemporaneous notes documenting Plaintiff's appointments. Laverne stated in her certification in support of Plaintiff's FMLA application (submitted during the Elimination Period) that Plaintiff suffered from anxiety, depressive symptoms, and panic attacks, again echoing what she had consistently observed and recorded for the past few months. AR 128. Further, Laverne noted that Plaintiff had been referred for medication management and a psychiatric assessment, reflecting Everett's goal of getting the Plaintiff stabilized on medications that were effective for her. AR 128. Gaudette, who had diagnosed Plaintiff with capillary fragility, concurred with Laverne and opined that Plaintiff was currently unable to work and noted that Plaintiff's psychiatric state, which had been documented for months, at the time put her at risk for TIA if she were forced to continue working with her alleged harasser. AR 130. Further, Plaintiff's providers were consistent in describing how her symptoms impacted her ability to work in her occupation. In January, Laverne explained that Plaintiff's symptoms created problems with her memory, concentration, and ability to complete daily tasks like paperwork. AR 128. A few months later, in April and May 2017 Plaintiff's providers documented Plaintiff's memory difficulties, dizziness, disorientation, difficulty focusing, agitation, and difficulty adjusting to her medications. AR 419, 430, 439. It is clear that such symptoms would have a deleterious impact on Plaintiff's management, organizational, and communication skills and make it difficult for Plaintiff to successfully maintain her

employment as a bank manager. *See Gallupe v. Sedgwick Claims Mgmt. Servs.*, 358 F.Supp.3d 1183, 1193 (W.D. Wash. 2019) (symptoms of anxiety, depression, and PTSD impacted plaintiff's ability to do job which required focus, attention to detail, communication, and collaboration).

United questions the accuracy and value of Laverne's and Gaudette's statements in support of Plaintiff's LTD claim because they are untimely; however, those statements should not be discounted simply because they were submitted after the Elimination Period, when Plaintiff submitted her LTD claim. *Smith v. Brown*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("It is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis."); *see also Tam v. First Unum Life Ins. Co.*, 491 F.Supp.3d 698, 711 at n.11 (C.D. Cal. 2020). To the extent that the Everett Clinic records do not indicate that Plaintiff's providers told her to stop working around December 23, 2017, the Court notes that Plaintiff is not required to demonstrate that her condition changed significantly around that time, and there is no "incompatibility between working full time and being disabled from working full time." *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1322 (D. Or. 2012) (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). Additionally, the "primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations." *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) (not requiring that a medical condition be listed in every report to conclude that a physician's opinion is supported by the record and viewing record in its entirety). The record reflects that Plaintiff's providers consistently noted her diagnoses, symptoms, and life stressors (like workplace harassment and co-parenting disputes) that were exacerbating her underlying conditions and prior sexual trauma. This was likely in support of Plaintiff's continuity of care across several providers.

The Court finds the opinions and conclusions of LMHC Laverne, ANRP Gaudette, and ANRP Graber to be based on their consistent and numerous interactions with and observations of Plaintiff. While a plan administrator is not required to accord special deference to the opinions of treating physicians, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), a district court may credit the opinions of Plaintiff's providers. *Rorabaugh v. Continental Cas. Co.*, 321 Fed. Appx. 708, 709 (9th Cir. 2009). The record shows that Plaintiff's providers consistently documented mental health diagnoses and symptoms that negatively affected her life and ability to do her job.

ii.      *Documentation from Everett Clinic, Including PHQ Scores and Plaintiff's Medications, Provide Contemporaneous Evidence of Plaintiff's Disability During the Elimination Period and Beyond*

Defendant questions the sufficiency of the medical evidence documented by Plaintiff's providers at Everett Clinic, particularly the PHQ-12 and PHQ-9 scores. Dkt. # 15 at 8. Plaintiff argues that Plaintiff's PHQ scores are reliable evidence, and counters that United's failure to conduct an in-person examination (IME) is fatal to Defendant's claim. While the Court does not agree that the lack of an IME is completely fatal, the Court does find the in-person examinations and evaluations of Plaintiff's Everett Clinic providers to be more persuasive than the paper review conducted by RN Graber, Dr. Tse, and Dr. Ruff. *See Tam*, 491 F. Supp. 3d at 709 (finding in person evaluations more persuasive than contrary paper-only review by five doctors). The Everett Clinic providers consistently noted that Plaintiff presented symptoms such as irritability, anger, panic attacks, trouble sleeping, and talk of self-harm throughout the Elimination Period and beyond. The Court credits these observations and finds them particularly helpful "in the context of a disorder that is inherently subjective and self-reported." *Gallupe*, 358 F. Supp. 3d at 1193; *see also James v. AT&T West Disability Benefits Program*, 41 F.

ORDER-25

Supp. 3d 849, 880 (N.D. Cal. 2014) (abuse of insurer's discretion to not credit examining physician's observations as "objective evidence").

In addition, the PHQ-12 and PHQ-9 scores are objective evidence of Plaintiff's mental state and disability during and after the Elimination Period. At nearly each of Plaintiff's appointments from November 1, 2017 onward, her PHQ-9 scores were at or above the cutoffs that suggest major depression. *See,* Discussion, *supra,* at 5-17. There was only one day, March 17, on which Plaintiff did not report PHQ-9 scores at or above the cutoff. AR 400. Similarly, Plaintiff's PHQ-12 scores, which indicate "overall distress," *see e.g.,* AR 356, were often in the 2-3 range, with three being the most severe. The Court finds this evidence persuasive and sees no reason to ignore this evidence simply because it is based on self-reported information. "Psychiatric impairments are not as amenable to substantiation by objective laboratory testing as are physical impairments. The diagnostic techniques necessarily will be less tangible. Mental disorders cannot be ascertained and verified like physical ailments." *Kopicko v. Anthem Life Ins. Co.*, 565 F.Supp.3d 1197, 1206 (S.D. Cal 2021) (quoting *Gonzalez v. Astrue*, No. ED CV 08-1253 JEM, 2009 WL 2390843, at * 7 (C.D. Cal. Aug. 3, 2009)) (internal quotations omitted). Further, the many medications that Plaintiff was prescribed, such as clonazepam, sertraline, lamotrigine, estradiol, meloxicam, and trazodone (AR 346) reflect the severity of Plaintiff's condition and her providers' ongoing attempts to find medication that would keep her stable. The Court credits this contemporaneous evidence in the record as supporting Plaintiff's disability during and after the Elimination Period.

    iii.    *The Record Does Not Support the Contention that Plaintiff Could Perform Her Occupation Even After Being Separated From Her Harasser*

Defendant argues that Plaintiff was only prevented from working her specific job (due to contact with her harasser) and not generally as a bank manager. Dkt. # 12 at 22-24. Plaintiff argues that it was not the harassment, but the extent and severity of her

symptoms related to past sexual trauma and increased risk of TIA that necessitated her departure from her job. Dkt. # 16 at 8.

In support of their argument, Defendants cite *Ramsdell v. Aetna Life In. Co.*, No. 1:11-cv-00398-GZS, 2012 WL 3575193 (D. Maine July 31, 2012). In *Ramsdell*, defendant Aetna denied Ramsdell's claim for disability benefits after Ramsdell experienced severe sexual harassment and threats at work. *Id.* at *1. Ramsdell was diagnosed with PTSD and depression and experienced feelings of anxiety, agitation, tearfulness, fear, sleep disturbances. *Id.* at * 3. Ramsdell's providers opined that she was not able to work in a different environment, while an outside psychologist believed that Ramsdell's symptoms were primarily related to her job, and therefore not tied to the material duties of her occupation. *Id.* at *5. Ramsdell's providers noted that her condition was improving with therapy and concluded that she could function in most respects, that her depression was decreasing, and that she lacked ambition and was unmotivated. *Id.* While Plaintiff here, like Ms. Ramsdell, experienced mental health symptoms in connection with workplace harassment, Plaintiff's providers have never provided the opinion that Plaintiff *could* work, but simply lacks ambition or motivation. Plaintiff's providers make clear that Plaintiff experienced a flare up in PTSD and mood disorder symptoms based on and connected to the alleged harassment. The sexual harassment (and other stressful life events) *triggered* Plaintiff's symptoms stemming from pre-existing underlying conditions that disabled Plaintiff. *See, e.g.,* AR 129, 141, 327, 381. Unlike in *Ramsdell*, the record here does not reflect that Plaintiff's disabling conditions stemmed from the workplace harassment *or* were caused by her job as a whole.

Also, unlike Ramsdell, Plaintiff's providers indicate that Plaintiff was dealing with *other* additional life stressors that contributed to her condition. AR 305, 315, 323. ARNP Gaudette further supported the contention that it was Plaintiff's *symptoms*, and not simply her work situation, that made her unable to work when she stated in her

ORDER-27

Physician's Statement that Plaintiff "should not be in any type of work environment due to significant affect and mood stability," AR 140. Indeed, if it was only proximity to her alleged harasser that caused Plaintiff's difficulties, one would expect Plaintiff's symptoms to resolve in the months after Plaintiff's last day of work. However, that did not happen.

Instead, Plaintiff's providers consistently documented that her PTSD, mood disorder, and bipolar disorder symptoms remained present (*see, e.g.,* AR 315, 334, 340, 357, 369, 388, 398), sometimes improving (AR 334, 339, 390, 400, 408), and sometimes getting worse (AR 327, 336, 379, 415). Plaintiff continued to exhibit symptoms, including instances of self-harm and suicidal ideations. Despite several visits in January in which her condition appeared to be improving, Plaintiff experienced a crisis in February due to the resurfacing of memories of sexual trauma. AR 379. Based on the timeline presented by the record, this crisis occurred almost two months after Plaintiff's last day at work (and presumably the last time Plaintiff would potentially interact with her harasser). It is clear that simply removing Plaintiff from the hostile working environment was not the silver bullet that Defendant portrays it as. The Court does not find the *Ramsdell* case to be analogous to the matter at hand. Plaintiff should not be penalized because her PTSD, mood disorder, and bipolar symptoms were triggered and exacerbated by the actions of a co-worker, and the Court is unaware of authority holding that only individuals whose disabling mental health symptoms arise *outside* of the context workplace are entitled to disability benefits.

Plaintiff's later attempts at work as a bookkeeper similarly do not undercut her disability claim. Plaintiff made several statements to her providers near or during the Elimination Period that she wanted to look for a new job and that she did in fact work for her partner doing bookkeeping for several weeks. AR 387, 400. Plaintiff reported that after working for several weeks she had to stop because her anxiety skyrocketed. AR 387, 390, 400, 402. Putting aside the fact that bookkeeping is not analogous to

Plaintiff's occupation as a bank branch manager, this buttresses Plaintiff's claim that she wanted to work but had difficulties maintaining employment due to her deteriorating mental health. It is evident that the symptoms that Plaintiff experienced and reported to her providers, such as panic attacks, anxiety, irritability, and anger are not compatible with performing an occupation that required strong customer service, business development, communication, interpersonal, and organizational skills. Plaintiff's attempt at work (for which Plaintiff indicated she was not paid) is not dispositive proof that Plaintiff could carry out the duties of her occupation, and the Court declines to see it as such. *See Kollar v. Sun Life Assurance Co. of Canada*, Case No. 3:19-cv-05180-RBL, 2019 WL 68939335, * 10 (W.D. Wash. Dec. 16, 2019) ("[I]t is possible that an employee may keep *trying* to work and draw salary for as long as possible despite being physically unable to fulfill their duties.").

### C. Remand is Not Warranted

Plaintiff requests that this Court remand the case back to United for a disability determination past the date of January 4, 2018. Dkt. # 14 at 27-28. Although remand is available on *de novo* review, it is usually not warranted where there is a fully developed record. *Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 942 (N.D. Cal. 1999). Here the two-thousand page record is fully developed and neither party sought leave to supplement the record regarding Plaintiff's medical condition after January 4, 2018. *See Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (trial court may admit extrinsic evidence beyond the administrative record in certain instances, including when there is additional evidence that the claimant could not have presented in the administrative process). Given that United admits that Plaintiff was entitled to restrictions and limitations from June 6, 2017 to January 4, 2018, the Court finds that remand to United is unwarranted.

ORDER-29

IV.     **CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Rule 52 Motion, and **DENIES** Defendant's Rule 52 Motion. Dkt. ## 14, 12.  United is directed to find that Plaintiff was disabled within the meaning of the Plan and entitled to receive LTD benefits from December 26, 2017 to January 4, 2018. United is directed to pay Plaintiff unpaid LTD benefits owing to her from December 26, 2016 to January 4, 2018, including pre-judgment interest on all unpaid benefits to be calculated in accordance with 28 U.S.C. § 1961. Plaintiff's request for attorney's fees shall be filed in conformity with LCR 54(d) within twenty (20) days.

Dated this 27th day of September, 2022.

The Honorable Richard A. Jones
United States District Judge

ORDER-30